## SOUTH GEORGIA HOLDING CO. v. HIATT.
### No. 122.

District Court, M. D. Georgia, Albany Division.
Jan. 13, 1933.

Jones, Jones, Johnston & Russell, of Macon, Ga., and S. B. Lippitt, of Albany, Ga., for complainant.

Bennet & Peacock, of Albany, Ga., for defendant.

DEAVER, District Judge.

The complainant, South Georgia Holding Company, is a corporation. Dermot Shemwell, H. H. Hedrick, and R. W. Gee constituted its board of directors and were its only officers. The defendant, W. S. Hiatt, as receiver of the New Georgia National Bank, was engaged in winding up the affairs of said bank.

Among the assets of the bank in the receiver's hands were obligations of Dermot Shemwell of approximately $104,000, a judgment against the Albany Company amounting to approximately $5,700, and 101.44 shares of stock in the South Georgia Trust Company, a corporation which was succeeded by the complainant, South Georgia Holding Company, stock in the latter company being issued in lieu of stock in the former. Hiatt, receiver, had not actually surrendered the certificates of stock in the former held by him and received certificates of stock in the latter, but in the trial the stock held by Hiatt, as receiver, was regarded for all practical purposes as stock in the complainant company. The receiver and Shemwell entered into a tentative contract for the sale of these assets to the complainant, subject to approval, on the one hand, by the Comptroller, and, on the other hand, by the directors of the corporation.

On January 14, 1932, the directors adopted the contract, by the terms of which the receiver was to accept an obligation for $15,000 payable half in six months and half in twelve months, secured by the deposit, as collateral, of $76,000 face value first mortgage bonds of the South Georgia Pecan Company, property of the complainant.

The receiver held also, as an asset of his trust, obligations against H. H. Hedrick amounting to $9,079.54. Before the sale was

finally consummated, it was agreed that the obligations against Hedrick should be included in the assets sold, the only new consideration being that the deferred payments should bear interest at the rate of 4 per cent.

On April 8, 1932, J. P. Champion was appointed receiver for Dermot Shemwell and was ordered to take possession of 926 shares of stock in the South Georgia Holding Company, standing in the name of Dermot Shemwell, trustee, and to vote the stock so as to conserve the assets of said company until the ownership of the stock should be determined. A stockholders' meeting was called for April 22, 1932, at which Dermot Shemwell, H. H. Hedrick, and R. W. Gee were removed as directors and J. P. Champion was elected president and J. P. Champion, J. A. McGill, and W. G. Eager were elected directors.

Thereafter this bill was brought to cancel the contract by which Hiatt, receiver, sold the assets hereinbefore mentioned to complainant, on the ground that Dermot Shemwell and H. H. Hedrick, because of interest adverse to the corporation, were disqualified as officers to bind the corporation by the contract, and were disqualified as directors to vote either for or against a resolution dealing with it, and on the further ground that the contract was fraudulent.

■ A director is not as a matter of law disqualified to vote on a resolution authorizing the corporation to purchase an obligation against him. If a director worth $5,000,000 owed a third person $100,000 due in twelve months and intended to pay it, and his corporation had an opportunity to buy that obligation for $10,000, and he voted for a resolution authorizing the purchase, his vote being necessary to constitute a majority vote of the board, it is inconceivable that a court, at the instance of a new board of directors, would be compelled as a matter of law to hold the contract void and cancel it regardless of its fairness and benefit to the corporation. Of course, a new board under those circumstances would not bring such an action, but the law question would be the same. If in such a case the director is disqualified, the contract is without authority and void. If in that case the contract would not be void for want of authority, then it would not be void for want of authority if, between the making of the contract and the filing of the suit, the director, by some unforeseen disaster, lost everything he had. It is immaterial to a director whether he owes one person or another, if he in good faith expects to pay, and legally he has no interest in the purchase by

the corporation of his debt. If he has any interest adverse to the corporation, it is not because it is his debt being purchased but because of some fraudulent purpose; and in that event the contract, if void, would be void for fraud and not for disqualification of the director.

■ Counsel for complainant cite authorities holding that, if an officer adversely interested deals with his corporation through himself, or if a director adversely interested deals with his corporation through the board of directors, and his vote is necessary to make a quorum or a majority of a quorum, the contract may be set aside by the corporation regardless of its fairness. Those authorities are not applicable here, because the officers and directors in this case were not in a legal sense interested adversely to the corporation, and they were not dealing with the corporation, but were representing the corporation in making a contract with a third person. For the same reason other authorities cited are inapplicable, which hold that, if an officer interested adversely to the corporation deals with the corporation through other officers, the contract is voidable only if unfair or entered into in bad faith, but that the burden is on the one seeking to uphold the contract to show fairness and good faith. The bill in this case brings in question a contract made by a corporation through its directors with a third person, and the only theory on which the bill is good is that the corporation may have the contract set aside for fraud of its directors, participated in or at least known to the other party to the contract. In such a case, the burden is on complainant to show the fraud.

■ By the contract complainant received the 101.44 shares of stock held by the receiver, a judgment against the Albany Company for approximately $5,700, obligations against Hedrick for over $9,000, and obligations against Shemwell for well over $100,000. The purchase price was $15,000.

According to the evidence the judgment against the Albany Company is good. The obligation against Hedrick is probably worth little, if anything. In determining the value to complainant of the Shemwell obligations, it is necessary to consider more than their legal collectibility. Shemwell was known to be a man of unusual business ability. He had promoted numerous business enterprises and had been connected with large business affairs. At the time of this contract, he had had serious reverses, but was not in the hands of a receiver. He was drawing a salary from

one company of $18,000 a year. The future of complainant was largely dependent upon his management. Complainant now alleges that he was the dominating influence in its business, and that for a number of years he had been engaged in other promotional enterprises and was anxious to get these obligations out of the hands of defendant, so that he could not be bothered by them in his promotional enterprises. That is probably true, but it is also true that complainant's future success, as well as the value of its own stock, depended in large measure upon his being in position to continue putting his dominating spirit and rare ability into its business. From the standpoint of complainant as it was then situated, it was good business to buy those obligations for $15,000, because, viewed under conditions existing at that time, it stood no chance to lose any part of that sum, but did stand a chance to make a profit, and at the same time to leave its president, who was the life of its business, unhampered to increase its assets and the value of its stock, including that being bought from the receiver.

Complainant says it could have bought the stock for $5,000, but it no doubt considered the stock worth much more provided it could also free Shemwell from the harassment of the obligations held against him by Hiatt. But even if the stock be valued at only $5,000, still the judgment against the Albany Company was worth $5,700, making a total of $10,700. It would have to collect from Shemwell only about $4,300 to make up the purchase price. Complainant alleges that Shemwell had promoted various other businesses, and was then drawing a salary of $18,000. Complainant, it is true, alleges also that his salary was not subject to the processes of the Georgia courts, so that Hiatt could not reach it. That, however, does not mean that Shemwell did not intend to pay at least enough to keep complainant from losing by the purchase, especially when it would require only about $4,300, even if the stock were worth only $5,000. It was no doubt thought that, in the purchase, the stock was worth much more. It follows, therefore, that, as matters appeared at that time, complainant would not lose even if it never collected any of the $100,000 from Shemwell.

There was an apparent misstatement of fact by the witness Gee, who testified that at the time of the contract Shemwell was negotiating for the sale of certain stock in the D. N. Corporation for $25,000 and promised to pay $5,000 out of the proceeds to the complainant, while Shemwell testified that the ne-

gotiations did not take place until after the contract was made. However, Shemwell also testified that he had previously negotiated for the sale of stock for $50,000, and it might well be said that Gee had in mind the previous negotiations.

A statement made by Hiatt, as receiver, to the Comptroller and attached to his petition for authority to make the sale, was put in evidence to show that Hiatt himself placed small values on the assets in question. Other facts, however, should be considered in connection with that statement. Shemwell owed Hiatt, as receiver, over $100,000, and, instead of paying such part of it as he could have paid, he so arranged his affairs that the receiver could neither locate any leviable property, nor subject the salary being drawn by Shemwell. Therefore, the obligations in the hands of the receiver had little immediately collectible value. The receiver desired to wind up the affairs of the bank as soon as possible. An immediate sale of Shemwell's obligations to some other purchaser would have brought the receiver little money, and would have left those obligations outstanding against Shemwell, to interfere with his successful operation of complainant company and thereby reduce the value of complainant's stock, including that held by the receiver. If the assets were sold to complainant, Shemwell could be reasonably expected to pay at least enough to keep that company from losing any money, and to continue to serve the company and enhance the value of the stock. Therefore, Shemwell's obligations and the stock held by the receiver were worth more to complainant than to any one else. Hiatt, according to his testimony, regarded complainant as the logical purchaser which could ultimately realize much more from these assets than anyone else. In that view of the matter, the receiver no doubt thought best to recommend the sale, and, in his statement to the Comptroller, to place upon these assets, not the value to complainant, but the value which he might be able to realize within a short time if no sale were made to complainant. Therefore, the value of these assets, as stated in his letter to the Comptroller, does not necessarily represent even Hiatt's estimate of their value to complainant, much less their actual value to it. Moreover, believing the sale to be to the interest of both his trust and the purchaser, he in his statement to the Comptroller probably fixed the value of the assets at the lowest possible figure consistent with good faith. It is the value of the assets to complainant which is important in deter-

mining the fairness of the contract, and not their value to any stranger differently situated.

In any event, whether all the foregoing observations are correct or not, the evidence does not show that Shemwell and Hedrick, as officers or directors, intended to defraud complainant, or to cause it to sustain any loss on account of the purchase. Nor does it show that Hiatt had any such purpose, or knew of any such purpose on the part of the directors. Hiatt, according to his testimony, thought complainant was receiving full value; and he made the sale because he felt it was his duty to wind up the affairs of the bank as soon as possible, and because he knew complainant could well afford to pay more for the assets than anyone else.

The intention of the directors and the defendant must be determined by conditions as they then existed, and not in the light of subsequent developments. It does not appear, even now, that complainant will lose any money on the purchase. But even if it does eventually lose, the contract, when made, appeared to be fair and should not be set aside.

Accordingly, a decree will be entered denying the relief prayed for.